[No. H000204. Sixth Dist. June 23, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN L. WILSON et al., Defendants and Appellants.

**COUNSEL**

Chuck Nacsin for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Ann Jensen and Michael I. Mintz, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BRAUER, J.**—Defendant John L. Wilson pleaded guilty to conspiracy to manufacture methamphetamines and admitted two prior felony convictions. His nephew, defendant Tyrone Rogers, pleaded guilty to possession of methamphetamines. Pursuant to negotiated dispositions, Wilson was sentenced to six years in prison and Rogers to two.

The pleas followed the denial of a motion to suppress the fruits of a search of two properties. The search was conducted pursuant to two search warrants identical except for the description of the property to be searched. The validity of those search warrants is the issue on this appeal.

Defendants attack the warrants on three grounds: 1) the affidavits contained deliberately false information; 2) the issuing magistrate did not read the entire affidavits and attachments; and 3) the affidavits are insufficient to furnish probable cause.

As we will explain, defendants' cause is impaled on the tines of a trident wielded by the United States Supreme Court, tines called *Franks, Gates* and *Leon*.[1]

## I. THE FACTS

The physical evidence supporting the defendants' convictions was seized under authority of two warrants directing the search of two rural properties,

---

[1] *Franks* v. *Delaware* (1978) 438 U.S. 154 [57 L.Ed.2d 667, 98 S.Ct. 2674]; *Illinois* v. *Gates* (1983) 462 U.S. 213 [76 L.Ed.2d 527, 103 S.Ct. 2317]; *United States* v. *Leon* (1984) 468 U.S. 897 [82 L.Ed.2d 677, 104 S.Ct. 3405].

the "Wilson" and "White" properties five miles apart in the Parkfield area of southern Monterey County. Each ranch consisted of a main house as well as outbuildings and mobilehomes. Essentially, it was the belief of the law enforcement people that the two properties were utilized as a methamphetamine factory or lab so that the search was directed towards finding that drug as well as equipment and ingredients for its manufacture and the byproducts thereof.

The warrants were issued on the basis of essentially identical 17-page affidavits executed by Ralph L. Price, an investigator for the Monterey County Sheriff's Department. Each affidavit, supplemented by exhibits of lengthy police reports, reflects communications from and observations by law enforcement officers of Monterey and San Bernardino Counties as well as information secured from an untested confidential informant.

Stripped of trivia, duplications and orotund language, each affidavit reported the following: a San Bernardino deputy had been told by an informant that one X,[2] known to the officer as a career drug dealer, regularly traveled to Northern California in order to pick up large quantities of methamphetamines from his source, "possibly" the defendant Wilson. Wilson was also known to San Bernardino authorities as a person "involved in heavy criminal activities over a period of the last ten years." He had previously been sent to prison for conspiracy to manufacture methamphetamines and been released only in 1983. A search warrant had been served on X recently resulting in the recovery of narcotics. The informant told the deputy that X was about to embark on another trip to pick up nine pounds of methamphetamines from his source. He described in minute detail the truck X had rented for the purpose and how it was to be loaded with building materials. The police staked out X's home. When the informant's story proved correct, to the extent that it could be visually confirmed, the San Bernardino deputies followed the truck to Monterey County where it stopped first at one and then the other of the two properties involved here. It was independently verified that defendant Wilson resided at the Wilson place. Some of the building materials were unloaded at the White ranch. At this point the San Bernardino authorities sought the assistance of Monterey County for aerial surveillance, etc. On the way back to San Bernardino, X's truck was stopped and searched but no contraband was found in it. A citizen informant who was a high school principal had personally observed unusually heavy vehicle traffic, especially at night, coming to and going from the White property. Another citizen informant residing near the Wilson property advised that she had smelled a very strong odor of ether coming from the Wilson property since late summer of 1983 when the new tenants had moved in. She rec-

---

[2]We prefer not to name a person who is alleged to have engaged in criminal activities but whose guilt has not been adjudicated in this proceeding.

ognized the odor of ether as she was a hospital worker. An expert reported that the smell of ether accompanies the manufacture of methamphetamines.

Both defendants resided at the Wilson place. The search resulted in the seizure of a large quantity and variety of weapons, heaps of chemicals, chemistry books, a type of sludge which is a byproduct of the methamphetamine manufacturing process, a small amount of methamphetamine and $11,000 in cash. The Wilson house was equipped with a sophisticated detection system including TV camera, electronic transformers and monitors.

## II. THE LAW

We start with discussing the three pivotal cases in the abstract as their holdings interact and impinge on all of the defendants' contentions.

In *Franks* v. *Delaware, supra,* 438 U.S. 154, the United States Supreme Court for the first time created a right in a defendant to challenge the veracity of a facially valid search warrant affidavit. In reaching this conclusion, the court overruled a Delaware Supreme Court opinion which had held that a defendant under *no* circumstances may challenge the veracity of a sworn statement used by police to procure a search warrant. Justice Blackmun, writing for the majority, emphasized however that a defendant's right to assert such a challenge was of "limited scope, both in regard to when exclusion of the seized evidence is mandated, and when a hearing on allegations of misstatements must be accorded."

The *Franks* court specifically dealt with the question whether a defendant is entitled to an evidentiary hearing to prove affirmative misstatements in the warrant affidavit. The court held a defendant must (1) offer specific proof that the affiant made statements which were deliberately false or in reckless disregard of the truth and (2) show that the affidavit is insufficient to justify a finding of probable cause without the allegedly false statements. The court explained: "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless

disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." In a footnote, the Supreme Court points out that if what is left is sufficient to sustain probable cause, the inaccuracies are *irrelevant*. The court goes on: "On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing. Whether he will prevail at that hearing is, of course, another issue." (*Id.*, at pp. 171-172 [57 L.Ed.2d at p. 682].)

*Illinois* v. *Gates, supra,* 462 U.S. 213, abandoned the "two-pronged test" established in *Aguilar* v. *State of Texas* (1964) 378 U.S. 108 [12 L.Ed.2d 723, 84 S.Ct. 1509] and *Spinelli* v. *United States* (1969) 393 U.S. 410 [21 L.Ed.2d 637, 89 S.Ct. 584] and substituted a "totality-of-the-circumstances" analysis. Veracity of the informant and the basis of his knowledge are not independent elements, a deficiency of one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability. (*Illinois* v. *Gates, supra,* 462 U.S. at p. 233 [76 L.Ed.2d at p. 545].) The Supreme Court explained that probable cause is a "practical, non-technical conception." "[S]earch and arrest warrants long have been issued by persons who are neither lawyers nor judges, and who certainly do not remain abreast of each judicial refinement of the nature of 'probable cause.' . . . The rigorous inquiry into the *Spinelli* prongs and the complex superstructure of evidentiary and analytical rules that some have seen implicit in our *Spinelli* decision, cannot be reconciled with the fact that many warrants are—quite properly . . .—issued on the basis of nontechnical, common-sense judgments of laymen applying a standard less demanding than those used in more formal legal proceedings." (*Id.*, at pp. 235-236 [76 L.Ed.2d at p. 546].)

The high court also specified most emphatically the attitude expected of reviewing courts: "Similarly, we have repeatedly said that *after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review.* [Italics added.] A magistrate's 'determination of probable cause should be paid great deference by reviewing courts.' . . . 'A grudging or negative attitude by reviewing courts towards warrants' . . . is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant." (*Id.*, at p. 236 [76 L.Ed.2d at pp. 546-547].) As to the criterion to be applied in the future: "The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." (*Id.*, at pp. 238-239 [76 L.Ed.2d at p. 548].)

Finally, the court stressed the quantum of proof necessary to corroborate an untested informant. "[A]n affidavit relying on hearsay 'is not to be deemed insufficient on that score, so long as a substantial basis for crediting the hearsay is presented.'" (*Id.,* at pp. 241-242 [76 L.Ed.2d at p. 550].) Because an informant is right about some things, he is more probably right about other facts. "It is enough, for purposes of assessing probable cause, that '[c]orroboration through other sources of information reduced the chances of a reckless or prevaricating tale,' thus providing 'a substantial basis for crediting the hearsay.'" (*Id.,* at pp. 244-245 [76 L.Ed.2d at p. 552].)

In *United States* v. *Leon* (1984) 468 U.S. 897 [82 L.Ed.2d 677, 104 S.Ct. 3405], the Supreme Court held that evidence is not subject to suppression if it was seized by an officer acting in the good faith execution of a search warrant which was subsequently found to be defective for want of probable cause. That holding is not germane to our case as we have concluded that the search warrant here in issue was amply supported by probable cause. But in the course of the opinion, the Supreme Court delivered itself of a number of rulings which are pertinent here.

First, the court explained that the cost exacted by the exclusionary rule is high and that the remedy should therefore be sparingly applied: "'Our cases have consistently recognized that unbending application of the exclusionary sanction to enforce ideals of governmental rectitude would impede unacceptably the truth-finding functions of judge and jury.' . . . Particularly when law enforcement officers have acted in objective good faith or their transgressions have been minor, the magnitude of the benefit conferred on . . . guilty defendants offends basic concepts of the criminal justice system. [Citation.] Indiscriminate application of the exclusionary rule, therefore, may well 'generat[e] disrespect for the law and the administration of justice.' [Citation.] Accordingly, '[a]s with any remedial device, the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served.'" (*Id.,* at pp. 907, 908 [82 L.Ed.2d at pp. 688, 689].)

Next, the court adopted the position of Mr. Justice White concurring in *Illinois* v. *Gates, supra,* that "'[s]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness,' . . . for 'a warrant issued by a magistrate normally suffices to establish' that a law enforcement officer has 'acted in good faith in conducting the search.'" (*Id.,* at p. 922 [82 L.Ed.2d at p. 698].) Four exceptions were recognized in which suppression remained an appropriate remedy: 1) the *Franks* v. *Delaware* situation; 2) the case of a magistrate who wholly abandons his impartial judicial role as in *Lo-Ji Sales, Inc.* v. *New York* (1979) 442 U.S. 319 [60 L.Ed.2d 920, 99 S.Ct. 2319], where he signed a search warrant in blank, then went to a dirty-book store, examined some of the wares there on display

and thereafter inserted in the warrant the titles of the books he had found objectionable; 3) where the affidavit is so lacking in indicia of probable cause as to render belief in its existence entirely unreasonable; and 4) where the warrant is so facially defective as not to particularize the place to be searched or the things to be seized.

Lastly, the court pointed out that the exclusionary rule is designed to deter police misconduct rather than to punish errors or neglect of judges and magistrates; and that the exclusion of evidence seized pursuant to a warrant would not have a significant deterrent effect on judicial officers. Suppression as a result of the conduct or inaction of magistrates as distinguished from police officers is justified only if there is allegation and proof that the magistrate abandoned his detached and neutral role. (*United States* v. *Leon, supra,* 468 U.S. at pp. 915, 916-918, 924-926 [82 L.Ed.2d at pp. 694, 695, 700, 701].)

In short, the message delivered by the highest judicial authority is plain. The discharge, unpunished, of guilty defendants exacts an enormous price from society. Consequently, the sanction of suppressing relevant evidence should be reserved for cases of the most serious misconduct committed by agents of the commonwealth. With specific reference to facially sufficient warrants issued by neutral magistrates, it is a rare day indeed when they can be successfully challenged. One who ventures upon that effort better have his facts and figures, and they should be compelling. A fishing expedition will not be entertained.

### III. DEFENDANTS' CONTENTIONS

In the light of the binding precedents detailed above, we are now ready to address the defendants' specific claims of error.

### 1. *The Alleged Misconduct of the Affiant*

Towards the end of Investigator Price's 17-plus-page affidavit appeared the following language with reference to the return trip of X after his sojourn at the Wilson and White ranches: "Upon stopping the suspected carrier vehicle in San Bernardino County no methamphetamine was located during that search. I don't believe that to be conclusive that there was no methamphetamine on the vehicle. The length of time that the carrier vehicle stayed at the 'old White' residence was sufficient time for a large quantity of methamphetamine to be secreted in areas on or about the vehicle which could not reasonably be searched without a warrant. The San Bernardino County deputies did not have a warrant for either the driver, or the vehicle at the time of their traffic stop and subsequent cursory search of the vehicle."

At the preliminary hearing[3] Investigator Price was examined with respect to that language as follows:

"Q. [defense counsel]: Well, you go on to say in the next paragraph, the next sentence, 'the San Bernardino County Sheriff's deputies did not have a warrant for either the driver or the vehicle at the time of their traffic warrant [*sic*]. You didn't know that but you put it in there; were you guessing?

"A. [PRICE]: Well, if I put it in there I probably knew, but I didn't recall that I had known whether or not they had a warrant.

"Q. And right now you don't know.

"A. No. If I put it in there, though, I was probably furnished the information, but from memory I cannot tell you now whether I knew or not.

"Q. You say there was a subsequent cursory search of the vehicle. You didn't know that; did you?

"A. I can't remember.

"Q. What's the basis of that statement in the search warrant affidavit?

"A. I don't know."

In the first place, *Franks* teaches that this entire line of questioning is totally impermissible in the absence of an offer of proof buttressed by declarations of competent witnesses which establish that the relevant allegations are false and known by Price to be false or made with reckless disregard of the truth. That should put the quietus to this part of the inquiry.

But just in case the People's failure to object could be construed as a waiver of this impropriety (and we by no means entertain that view) we address the merits because they can be so quickly disposed of: in making that statement in his affidavit, Investigator Price did not purport to speak of his own knowledge; he was quoting a Deputy Sheriff Wolting. His lack of personal knowledge is therefore totally understandable. Wolting was also called as a witness but he was not asked about the source of his information. His police report is attached to Price's affidavit. It recites that a Sergeant Reneau had told him that X's truck was searched and the occupants were not arrested. This does not negative the possibility of Wolting having learned from percipient witnesses that the search had been cursory and conducted

---

[3] The transcript of the preliminary examination was introduced in evidence at the hearing on the Penal Code section 1538.5 motion. All further statutory references are to the Penal Code.

without a warrant. What trial judge cannot attest that officers often remember facts on the stand which they neglected to put in their police reports? Thus, the pertinent paragraph in the affidavit has not been established to be false[4] and certainly not intentionally or recklessly false. Even if intentional falsehood had been proved, the only remedy under *Franks* is excision. The effect of such surgery is discussed *infra*.

### 2. *The Alleged Misconduct of the Magistrate*

██ Municipal Court Judge Howard T. Hudson, the issuing magistrate, was subpoenaed and testified both at the preliminary examination and at the section 1538.5 hearing in Superior Court. He stated that he had read the two affidavits in their entirety and had scanned through the police reports which were attached as exhibits. By "scanned" he meant that he "read parts of the paragraphs: opening sentence of the paragraph to see what the subject matter was, what they were talking about."

Defendants contend that the fruits of the search must be suppressed because the magistrate did not read every word of the attached police reports. They rely on *Kaylor* v. *Superior Court* (1980) 108 Cal.App.3d 451 [166 Cal.Rptr. 598]. In *Kaylor* search warrants were issued on the basis of 2 skeletal affidavits which incorporated 155 pages of xeroxed police reports, some of whose pages were illegible. The magistrate was put on the stand and testified that he did not read all the reports. The court ruled, two to one, that the evidence had to be suppressed because the magistrate must read the entire affidavit and he cannot perform his required role when portions of the affidavits are illegible. The majority found it unnecessary to ask whether the illegible pages in any way detracted from the adequacy of the remaining reports which clearly established probable cause. And, of course, when the fruits of a search are suppressed, the guilty defendant ordinarily goes free rather than merely being remanded for retrial. With commendable restraint, the dissenting justice referred to the majority opinion as "ludicrous" and accused his brethren of engaging in a "seemingly over-zealous quest to find some Constitutional infirmity in the warrant process."

The Third Appellate District which had authored *Kaylor* hastened to narrow its sweep. In *People* v. *Kashani* (1983) 143 Cal.App.3d 77 [191 Cal.Rptr. 562] defense counsel had served the magistrate with a subpoena to testify at a suppression hearing, claiming that the judge had failed to read all the supporting material before issuing a search warrant. The trial judge quashed the subpoena on the ground that defendant had not shown

---

[4]Investigator Price testified that, as far as he knew, Deputy Wolting had not spoken to any of the San Bernardino officers who had searched X's truck. That testimony is merely evidence of Price's state of mind which is irrelevant. Price was not competent to speak to Wolting's knowledge or its source.

good cause to challenge the presumption of regularity attending issuance of the warrant. The Court of Appeal affirmed pointing out that there is no open season on the magistrate and that no justification exists for arraigning him every time a search warrant is issued and requiring him to explain his conduct in the premises; indeed, there are compelling reasons why it should not be so. (*Id.*, at p. 80.) *Kaylor* was distinguished because there the warrant was facially defective.

Whatever vitality *Kaylor* retained after *Kashani,* it has none after the enactment of Proposition 8[5] because *Kaylor* is totally at variance with the specific holding and the philosophy of *Franks, Gates* and *Leon.* With rhythmic regularity, the United States Supreme Court has warned lower courts against displaying a grudging or negative attitude towards warrants. If the officer submitting the affidavit may not be put on the stand at an evidentiary hearing without a prima facie showing by competent evidence of facts which would justify suppression, a fortiori the magistrate may not be subjected to that experience without a similar showing.[6] And it must again be stressed that the only conduct of a magistrate, as distinguished from that of a police affiant, which is egregious enough to trigger suppression is the shedding of his mantle of neutrality and assumption of the role of an "adjunct law enforcement officer," conduct denounced in *Lo-Ji Sales Inc.* v. *New York, supra,* 442 U.S. 319.

The district attorney, however, stated in the trial court that by consenting to Judge Hudson's testifying at the preliminary hearing, he could not thereafter object. Be that as it may, the abandonment of Judge Hudson by those charged with protecting him had no result except to expose the judge to an unpleasant and unnecessary experience; it cannot affect the decision here. We are not dealing with a skeletal declaration buttressed solely by attached police reports. There is a most carefully drafted 17-page affidavit which the judge had read in its entirety and which had made a good faith and successful effort to summarize the information contained in the reports. There was actually no reason to attach the exhibits. They added nothing of consequence to the affidavit itself, and they certainly did not contradict that sworn document in material respects. And defendants do not even suggest that the magistrate had departed from his proper function of standing impartially between the citizen and the police.

---

[5]California Constitution article I, section 28.

[6]The Monterey County Counsel's office planned to move to quash the subpoena served on the magistrate. When county counsel failed to appear, the prosecutor elected not to object because he did not want to delay the hearing. Judge Hudson was then subjected to an inappropriate if not offensive cross-examination, being asked about his age, whether he is a speed reader, his eyesight and its effect on his driving ability (!) and his familiarity with chemical terms.

### 3. *The Alleged Lack of Probable Cause*

■ This claim will not detain us long. The affidavit recited: 1) that a very strong odor of ether emanated from an isolated ranch property for a period of six months ever since defendant Wilson had taken possession; 2) that Wilson was a convicted manufacturer of methamphetamines; 3) that the smell of ether accompanies the manufacture of methamphetamines; 4) that an untested informant had identified defendant Wilson as the possible large scale methamphetamine supplier of a Southern California dealer; and 5) facts confirming the connection between Wilson's abode and the dealer. The totality of these circumstances was ample to convince a detached and neutral magistrate of the likelihood that Wilson had gone back to his former trade and that he was plying it at the property in question.[7]

Defendants cite *United States* v. *Tate* (9th Cir. 1982) 694 F.2d 1217 and *People* v. *Dickson* (1983) 144 Cal.App.3d 1046 [192 Cal.Rptr. 897] for the proposition that because ether has many benign household uses, its smell is insufficient without more to furnish probable cause. No doubt. But we have much more here: the duration and strength of the odor, the report of the informant and, most importantly, defendant Wilson's occupational background.

■ Finally, defendants protest that the information was stale. The basis for that charge is that the last date on which the neighbor smelled ether was February 1, 1984, but the affidavit was not executed until March 12, 1984.

The answer is found in the often cited quotation from *Andresen* v. *State*, 24 Md.App. 128 [331 A.2d 78, 106] affd. *sub nom. Andresen* v. *Maryland* (1976) 427 U.S. 463 [49 L.Ed.2d 627, 96 S.Ct. 2737]: "The likelihood that the evidence sought is still in place is a function not simply of watch and calendar but of variables that do not punch a clock: the character of the crime (chance encounter in the night or regenerating conspiracy?), of the criminal (nomadic or entrenched?), of the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), of the place to be searched (mere criminal forum of convenience or secure operational base?), etc. The observation of a half-smoked marijuana cigarette in an ashtray at a cocktail party may well be stale the day after the cleaning lady has been in; the observation of the burial of a corpse in a cellar may well not be stale three decades later. The hare and the tortoise do not disappear at the same rate of speed." As stated by Professor La Fave in his treatise on Search and Seizure, section 3.7, pages 683-684 (West Publishing Co. 1978): "Of the factors identified in *Andresen,* the one which is most fre-

---

[7]Even if, as defendants insist, the failure to find contraband in X's truck upon its return from the Wilson ranch totally destroyed the credibility of the informant—a contention we do not accept—the rest was still sufficient under *Gates.*

quently relied upon in the appellate decisions is the character of the criminal activity under investigation." (*Id.,* at p. 684.) And again: "'[T]he continuity of the offense is the single most important factor in the determination of whether the probable cause is valid or stale . . . .'" (*Id.,* at p. 686.) The inference reasonably to be drawn from the affidavit in our case is that the criminal activity in issue was the maintenance of a methamphetamine factory. That factory was in operation for the six months preceding February 1, 1984. It was run by defendant Wilson who remained in possession of the relevant premises until the time the warrant was sworn out. Under those circumstances the magistrate was correct in considering it likely that the factory would still be functioning at the locality to be searched when he signed the warrant. The information was not stale.

The judgments are affirmed.

Agliano, P. J., and Phillips, J.,* concurred.

Appellants' petition for review by the Supreme Court was denied September 11, 1986. Bird, C. J., and Reynoso, J., were of the opinion that the petition should be granted.

---

*Assigned by the Chairperson of the Judicial Council.