[No. F008663. Fifth Dist., June 17, 1988.]

THE PEOPLE, Plaintiff and Appellant, v.
DAVID ROYAL GESNER et al., Defendants and Respondents.

■■■■■■■■■■■

COUNSEL

John K. Van de Kamp, Attorney General, Steve White, Chief Attorney General, Joel Carey and Lisbeth Bellet, Deputy Attorneys General, for Plaintiff and Appellant.

Patricia Quintiliani, Barry Melton and Susan M. Reiter, under appointments by the Court of Appeal, and Anthony J. Chargin for Defendants and Respondents.

OPINION

**BROWN, (G. A.), J.**[*]—Respondents David Royal Gesner, Lavonia May Gesner, Kevin R. Smith and Mark M. Gesner were charged with violating Health and Safety Code sections 11359 (possession of marijuana for sale) and 11360 (conspiracy to transport, furnish or sell marijuana). Respondent Kevin Smith was charged with aiding and abetting respondents Mark Gesner, David Gesner and Lavonia Gesner in the possession for sale of marijuana. (Pen. Code, § 31; Health & Saf. Code, § 11359.)

Respondents moved to suppress the evidence and to quash the search warrant. (Pen. Code, § 1538.5.) Following a hearing, the superior court suppressed all items seized from the Gesner residence and dismissed the information as to all respondents. The People appeal.

FACTS

In November 1986, the Tuolumne County Sheriff's Department was advised by Oregon law enforcement authorities that respondents Mark and David Gesner, who were brothers, were suspected of transporting large amounts of marijuana from Sonora, California, to Oregon. The brothers, together with David's wife Lavonia and her children, lived in a trailer home in Sonora. These two law enforcement agencies were also cooperating in an ongoing investigation of the Gesners regarding the possible manufacture of methamphetamine and transportation of weapons.

On December 5 and 8, 1986, Bridgette Myers, respondent Lavonia Gesner's[1] 16-year-old daughter, contacted the sheriff's department and reported

---

[*] Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

[1] Lavonia is David Gesner's wife; thus David is the stepfather of Bridgette Myers, John Myers and Larry McIntosh, Lavonia's children. Mark Gesner is David's brother.

that there were large garbage bags of marijuana stored outside the Gesner residence.

On December 16, 1986, John Myers, Lavonia Gesner's 14-year-old son, was caught with marijuana at school. He admitted to a deputy sheriff that he got the marijuana at home. He stated there were presently three garbage bags full of marijuana which were kept outside mixed in with the real garbage.

The sheriff's department also received additional information from Bridgette Myers on December 16. She reported that Mark Gesner was on his way to Sonora from Oregon. When asked about the bags of marijuana, she stated that three of them had been given to Al Shaw but that her mother still had a large bag in her bedroom which was apparently being broken down for sale. On December 17, Bridgette again contacted the sheriff's department and reported that Mark Gesner and Kevin Smith had arrived at around 6 a.m. that morning and that the large bags of marijuana were still at the residence.

On the morning of December 17, 1986, Officer John Baker began preparing an affidavit for a warrant to search the Gesner residence. The affidavit was not completed until approximately 7:45 p.m. Deputy Sheriffs Croslin and Adams were assigned to keep the Gesner residence under surveillance pending the arrival of that search warrant. At about 2 p.m. on December 17, they positioned themselves in a nearby residence belonging to Lavonia Gesner's parents. However, at about 4 p.m., Officer Croslin arrested Mark Gesner and Kevin Smith without a warrant when they walked toward him after leaving the Gesner residence. Thereafter, Officers Croslin, Hutchins and Wolfgang went to the Gesner residence where they arrested David Gesner on the front porch.

Officers Croslin and Hutchins entered the residence to search for other suspects and to secure the premises. During this cursory search for suspects, Officer Croslin saw marijuana "laying all over." Officer Croslin reported the entry to Officer Baker, the search warrant affiant, at about 4:15 p.m.

At 5:05 p.m., Officer Croslin put Lavonia Gesner's 19-year-old son, Larry (Buddy) McIntosh, on the phone with Officer Baker. Buddy told Baker that there was quite a bit of marijuana packaged in boxes at the home and that it was going to be "shipped out" soon.

Officer Baker completed the affidavit at 7:45 p.m. on December 17. Officer Baker included the conversation with Buddy McIntosh in the affidavit. He did not include any information concerning the arrests or the

entry or cursory search of the Gesner home but did verbally advise the magistrate that the residence had been secured and three subjects had been arrested.

The search warrant was thereafter issued and executed at approximately 8:45 p.m. At the Gesner residence, during the search, contraband was found and seized.

The affidavit of Officer John Baker in support of the search warrant included the following facts: (1) On December 17, 1986, Officer Croslin reported that Bridgette Myers had told him that there "were bags of marijuana at the residence where she resides with her mother, Lavonia May Gesner, a[lso] k[nown] a[s] Myers, and her stepfather, David Gesner";[2] (2) Bridgette had also stated that her stepfather, David Gesner, and her uncle Mark were selling marijuana from the residence; (3) Bridgette had further stated that her uncle Mark and a "Kevin" had arrived at the Gesner residence "last night" (Dec. 16) from Oregon; (4) Deputy Mosier reported on December 16, 1986, that Bridgette's brother, John Myers, had been caught with marijuana at school; (5) Deputy Mosier's supplemental report, dated December 17, 1986, and attached to the warrant and incorporated therein, reflected that John Myers said he got the marijuana at home, that his uncle, Mark Gesner, was continually bringing it down from Oregon, that his Uncle Mark and his stepfather, David Gesner, sell it, and that "right now" there were three garbage bags full of marijuana at the Gesner house which were kept outside; (6) the affiant received criminal activity reports from Salem, Oregon, "regarding the arrest and search of subject, including information on David and Mark Gesner"; (7) the affiant received a telephone report on November 19, 1986, that David Gesner and Mark Gesner "were buying chemicals and other clandestine lab equipment in Oregon and were, according to one of the informants, bringing the chemicals to California to start a clandestine lab for the manufacture of methamphetamine"; and (8) that Larry McIntosh told the affiant at 5:05 p.m. on December 17, 1986, that "there was marijuana packaged in boxes, quite a bit of it, and that he overheard his uncle Mark Gesner and a suspect who came down from Oregon with Mark talking about taking the marijuana back to Oregon . . . [and] that he had seen marijuana in the house before and soon it would be gone 'shipped out.' Lots of it."

## DISCUSSION

In support of their suppression motion in the trial court, respondents argued several bases for invalidating the warrant, including errors and

---

[2] Officer Croslin testified at the preliminary hearing that Bridgette told him about the marijuana on December 8, 1986, but that he believed she had initially reported the presence of marijuana to another officer on December 5, 1986.

omissions in the affidavit which they claim affected the magistrate's determination of probable cause; they also claim that the affidavit did not establish probable cause for the issuance of the search warrant and that evidence found in the Gesner home, even though seized pursuant to the search warrant, was tainted by the warrantless, illegal entry before the warrant was issued and therefore should be suppressed pursuant to *People* v. *Shuey* (1975) 13 Cal.3d 835 [120 Cal.Rptr. 83, 533 P.2d 211].

■ The trial court impliedly found the initial arrest and warrantless entry were illegal, the latter because there were no exigent circumstances justifying the entry, applied the principles of *Shuey* and suppressed the evidence stating: "All right. As to the 1538.5 motion, the Court's going to grant the motion. Those items that were seized as a result, out of the residence of the defendants, David and Lavonia Gesner, those items will be suppressed, they are contraband.

"The Court has read the transcripts of the preliminary examination consisting of three volumes, which were read before making this ruling, as well as listening to testimony of everything else. I think the Suie [*sic*] case pretty much sets it out. For that reason I'm going—for that reason I am granting the motion, 1538.5."

It does not appear from the record before us that the trial court reached or passed upon the other suppression issues.

In *Shuey,* the Supreme Court authorized suppressing evidence seized pursuant to a warrant when the premises had been "secured" before the warrant was obtained. The *Shuey* court stated: "Analytically this case can be regarded simply as involving a de facto, inchoate seizure . . . the moment the police began the illegal occupation. Thereafter the obtaining of the warrant could no more operate 'to disinfect this conduct' [citation] than if the police had actually seized the individual items sought to be suppressed prior to acquisition of the warrant." (13 Cal.3d at p. 850, fn. omitted.)

While not conceding the trial court was correct in concluding the warrantless entry was illegal because there were no exigent circumstances, appellant's argument and discussion are predicated on the assumption the trial court's conclusion in this regard was correct. Appellant relies upon *Segura* v. *United States* (1984) 468 U.S. 796 [82 L.Ed.2d 599, 104 S.Ct. 3380] in arguing that, regardless of the legality of the initial entry and securing of the premises, there was a sufficient independent source for the warrant under which the evidence was seized and therefore, under federal law, the evidence was improperly suppressed. Appellant concludes because the crimes were committed after the enactment of article I, section 28,

subdivision (d) of the California Constitution, federal law controls the admissibility of the suppressed evidence. (*In re Lance W.* (1985) 37 Cal.3d 873, 884-890 [210 Cal.Rptr. 631, 694 P.2d 744].) Appellant is correct.

In *Segura v. United States, supra,* 468 U.S. 796, the police, having probable cause to believe illegal drug activities were occurring in the defendant's premises, arrested defendants outside the premises and then entered and internally secured the premises to prevent the destruction of evidence of illegal drug activity for a period of 19 hours during which time a search warrant was obtained. There were no exigent circumstances justifying the entry. The information on the basis of which the search warrant was subsequently obtained was wholly independent of any knowledge obtained as a result of the illegal entry and preexisted the entry. The officers did observe in plain view some illegal drugs and paraphernalia after the initial entry. In the subsequent search, pursuant to the warrant, the agents discovered, inter alia, a large quantity of cocaine, a large sum of cash and records of narcotics transactions. The agents seized those items together with the items observed in plain view during the security occupancy.

The court, in holding the items seized pursuant to the warrant search should not be suppressed, discussed the two separate questions involved. "[F]irst, whether the entry and internal securing of the premises constituted an impermissible seizure of all the contents of the apartment, seen and unseen; second, whether the evidence first discovered during the search of the apartment pursuant to a valid warrant issued the day after the entry should have been suppressed as 'fruit' of the illegal entry." (468 U.S. at p. 798 [82 L.Ed.2d at p. 604].)

As to the first question, the court, in its own language, summarized its holding: "On this first question, we conclude that, assuming that there was a *seizure* of all the contents of the petitioners' apartment when agents secured the premises from within, that seizure did not violate the Fourth Amendment. Specifically, we hold that where officers, having probable cause, enter premises, and with probable cause, arrest the occupants who have legitimate possessory interests in its contents and take them into custody and, for no more than the period here involved, secure the premises from within to preserve the status quo while others, in good faith, are in the process of obtaining a warrant, they do not violate the Fourth Amendment's proscription against unreasonable seizures." (468 U.S. at p. 798, fn. omitted [82 L.Ed.2d at p. 604].)

As to the second issue, the court held: "The illegality of the initial entry, as we will show, has no bearing on the second question. The resolution of this second question requires that we determine whether the initial entry

tainted the discovery of the evidence now challenged. On this issue, we hold that the evidence discovered during the subsequent search of the apartment the following day pursuant to the valid search warrant issued wholly on information known to the officers before the entry into the apartment need not have been suppressed as 'fruit' of the illegal entry because the warrant and the information on which it was based were unrelated to the entry and therefore constituted an independent source for the evidence under *Silverthorne Lumber Co.* v. *United States,* 251 U.S. 385 (1920) [64 L.Ed. 319, 40 S.Ct. 182, 24 A.L.R. 1426]." (468 U.S. at p. 799 [82 L.Ed.2d at pp. 604-605].)

In this latter regard, the court further observed: "Whether the initial entry was illegal or not is irrelevant to the admissibility of the challenged evidence because there was an independent source for the warrant under which that evidence was seized. Exclusion of evidence as derivative or 'fruit of the poisonous tree' is not warranted here because of that independent source." (468 U.S. at pp. 813-814 [82 L.Ed.2d at p. 614].)

Thus, as we interpret *Segura, supra,* 468 U.S. 796, the United States Supreme Court impliedly rejected the broad exclusionary rule of *People* v. *Shuey, supra,* 13 Cal.3d 835. (See also *People* v. *Angulo* (1988) 199 Cal.App.3d 370 [244 Cal.Rptr. 819].)

Because the trial court applied an erroneous legal principle to the resolution of the suppression issue, the case will have to be reversed and remanded to the trial court for further proceedings on the suppression motion. (*People* v. *Kurland* (1980) 28 Cal.3d 376, 391 [168 Cal.Rptr. 667, 618 P.2d 213].) While we decline to determine in the first instance the remaining legal and factual issues on the record before us, some guidance to the trial court is appropriate.

As appears from the *Segura* opinion, while the officers may enter and secure the premises for a reasonable time absent exigent circumstances, they must have probable cause to believe that illegal drug activity is occurring on the premises. The trial court should make this determination.

Here, the information from the Oregon law enforcement agencies and Bridgette and John Myers was received before the illegal entry and thus is "wholly unconnected" with that entry. However, the telephone call from Buddy McIntosh came after the initial entry and arguably was instigated by Officer Croslin. This information, obtained as a result of the entry, could not be used by the magistrate as a basis for issuing the search warrant. (*Segura* v. *United States, supra,* 486 U.S. 796; *U.S.* v. *Grandstaff* (9th Cir. 1987) 813 F.2d 1353, 1355; *People* v. *Angulo, supra,* 199 Cal.App.3d 370.) Thus, the question becomes whether the affidavit, purged of this illegally

obtained information, contains a substantial basis for concluding that a search would uncover evidence of illegal drug activity. (*Ibid.*)

Another issue is whether sufficient probable cause supported the search warrant particularly in light of the errors and omissions in the affidavit. ▪ Since these crimes were committed after the enactment of article I, section 28, subdivision (d) of the California Constitution, federal law must be applied to determine the sufficiency of the affidavit supporting the search warrant. (*People* v. *Medina* (1987) 189 Cal.App.3d 39, 44 [234 Cal.Rptr. 256].)

▪ A warrant must be upheld if it meets the totality of the circumstances test of *Illinois* v. *Gates* (1983) 462 U.S. 213 [76 L.Ed.2d 527, 103 S.Ct. 2317]. (*People* v. *Mayer* (1987) 188 Cal.App.3d 1101, 1116 [233 Cal.Rptr. 832].) Under that analysis, "[t]he task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *(Illinois* v. *Gates, supra,* 462 U.S. at pp. 238-239 [76 L.Ed.2d at p. 548].)

As discussed above, in determining whether sufficient probable cause supported the issuance of the search warrant, the information received from Buddy McIntosh must be excluded. Additionally, the effect of several misstatements contained in the affidavit must be addressed. The affiant stated that Bridgette Myers had been threatened by David Gesner when in fact she had not been and that David Gesner had been arrested in Oregon when he had only been interviewed by the police. ▪ When such misstatements are included in an affidavit, the remedy is dependent upon whether the misstatements were negligent or deliberate and intentional.

"Under the federal standard enunciated in *Franks* v. *Delaware* (1978) 438 U.S. 154 [57 L.Ed.2d 667, 98 S.Ct. 2674], a criminal defendant may not challenge negligent misstatements or omissions in the affidavit." (*People* v. *Meyer* (1986) 183 Cal.App.3d 1150, 1161 [228 Cal.Rptr. 635].) However, if the misstatements were made either intentionally or with reckless disregard for the truth, they are excised from the affidavit. Only if the affidavit's remaining content is insufficient to establish probable cause will the search warrant be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit. (*People* v. *Truer* (1985) 168 Cal.App.3d 437, 441 [214 Cal.Rptr. 869].) "On the other hand,

if after excising the deliberate falsehoods from the affidavit the reviewing court finds that probable cause for the search still exists, then the warrant will stand, and the evidence need not be excluded." (*Ibid.*) In sum, when the material that is subject to the alleged falsity or reckless disregard is set aside and what is left is sufficient to sustain probable cause, any inaccuracies are irrelevant. (*People* v. *Wilson* (1986) 182 Cal.App.3d 742, 747 [227 Cal.Rptr. 528].)

Respondents allege the failure to include the fact of the initial entry in the affidavit was a material omission which negated the finding of probable cause. "An affiant's duty of disclosure extends only to material adverse facts, which, if omitted, would distort the probable cause analysis." (*People* v. *Berkoff* (1985) 174 Cal.App.3d 305, 310 [219 Cal.Rptr. 878].) In the case of an improper omission, the remedy is to add the omission and retest the facts for probable cause. (*People* v. *Luevano* (1985) 167 Cal.App.3d 1123, 1128, fn. 3 [213 Cal.Rptr. 764].)

The fact of the initial entry and the subsequent discovery of marijuana was not adverse to a finding of probable cause. Rather, a statement that marijuana had been observed inside the Gesner residence would have supported a finding of probable cause. Thus, this omission had no bearing on and is irrelevant to the probable cause analysis.

A further issue in this case concerns the admissibility of the marijuana observed in plain view during the initial illegal entry. In *Segura* v. *United States, supra,* 486 U.S. 796, the United States Court of Appeals held in its opinion that the evidence discovered in plain view during the initial entry must be suppressed. A review of this aspect of the court of appeals' holding was not sought in the Supreme Court by the government. Accordingly, the United States Supreme Court did not pass upon this issue. In the case at bench, this issue was raised at oral argument and undoubtedly will have to be resolved by the trial court on remand.[3]

When evidence validly obtained under a search warrant has been previously uncovered in an illegal search, both the Ninth Circuit and the Fourth Circuit have applied the inevitable discovery doctrine adopted by the Supreme Court in *Nix* v. *Williams* (1984) 467 U.S. 431 [81 L.Ed.2d 377, 104 S.Ct. 2501]. (*United States* v. *Merriweather* (9th Cir. 1985) 777 F.2d 503;

[3] This issue has now been resolved adverse to defendants in *Murray* v. *United States* (1988) 487 U.S. 533 [101 L.Ed.2d 472, 108 S.Ct. 2529]) filed June 27, 1988. In that case, the Supreme Court held that marijuana discovered after an unlawful entry was not subject to suppression if the marijuana was later seized pursuant to a search warrant which was issued based on information wholly independent of the information obtained from the illegal entry.

*U.S.* v. *Whitehorn* (4th Cir. 1987) 813 F.2d 646.) ▓ Under that doctrine, "even if evidence is initially obtained by unlawful government conduct, '[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale [for the exclusionary rule] has so little basis that the evidence should be received.'" (*United States* v. *Merriweather, supra,* 777 F.2d at p. 506.) As in *Nix* v. *Williams,* if the evidence would ultimately have been discovered, the rationale for the exclusionary rule is eviscerated.[4]

On remand, the trial court should determine if the contraband seen during the initial illegal entry would have been inevitably discovered pursuant to the search conducted under the warrant which, it appears on the record before us, would have been issued and executed even if the illegal entry had never taken place.

The order suppressing the evidence is reversed and the cause remanded for further proceedings consistent with this opinion.

Hamlin, Acting P. J., and Ardaiz, J., concurred.

A petition for a rehearing was denied July 7, 1988.

---

[4] In *Murray* v. *United States, supra,* 487 U.S. 533, __ [101 L.Ed.2d 472, 481-482], the court approved the inevitable discovery doctrine stating: "This 'inevitable discovery' doctrine obviously assumes the validity of the independent source doctrine as applied to evidence initially acquired unlawfully. It would make no sense to admit the evidence because the independent search, had it not been aborted, would have found the body, but to exclude the evidence if the search had continued and had in fact found the body. The inevitable discovery doctrine, with its distinct requirements, is in reality an extrapolation from the independent source doctrine: *Since* the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered."