Filed 3/21/25  P. v. Kill CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>THOR KILL,<br><br>        Defendant and Appellant. | A167966<br><br>(San Francisco City & County Super. Ct. Nos. CRI22002353, SCN235081) |

Thor Kill appeals after a jury convicted her of unlawful possession of ammunition by a prohibited person (Pen. Code, § 30305, subd. (a)(1)) and the trial court sentenced her to a two-year prison term.[1]  Kill argues that the trial court erred by denying her motion to quash the search warrant and to suppress evidence because the warrant was purportedly based on stale information.  We disagree and affirm.

**BACKGROUND**

**A.**

On April 27, 2021, officers from the San Francisco Police Department executed a search warrant at Kill's room at a San

---

[1] Undesignated statutory references are to the Penal Code. We deny as unnecessary Kill's request for judicial notice of the exhibits and petition she filed in a related writ petition.  (See *In re Reno* (2012) 55 Cal.4th 428, 484 ["[p]etitioners need not separately or specifically request judicial notice of all documents connected with their past appeals"].)

1

Francisco hotel.  At the time, the hotel was under contract with the City and County of San Francisco as a shelter-in-place hotel during the COVID-19 epidemic.  Kill was in the room when the officers arrived.  Inside the room, the officers recovered a California identification bearing the name "Thor Kill" and a Washington identification bearing the name "Samuel Isaac Valentine," both of which pictured Kill (albeit at different ages).  The officers also found an envelope addressed to Valentine, boxes containing lead bars and drill bits, and a "cask tool" in the hotel room.

Officers also searched a storage unit that Kill had rented.  The officers found (and seized) approximately 125 pounds of black powder, which is used as a propellant component in ammunition; approximately 3,600 bullets; approximately 34,000 primers; over 1,000 cartridge casings; approximately 87 firearm magazines; seven magazine carriers; and over 1,000 rounds of ammunition in the storage unit.  The officers also located mail and other documents bearing both names ("Thor Kill" and "Samuel Valentine")—including a package containing primers addressed to Kill—inside the storage unit.

The prosecution's firearms expert testified that a cartridge is a "single unit of ammunition" made up of four primary components: a bullet that sits on top, primer at the bottom, gun powder, and a cartridge case that holds everything together.  The firearms expert examined and tested a subset of the seized cartridges, which she found to be functional ammunition that was capable of being fired from a firearm.

Kill had previously been convicted, in 2012, of misdemeanor assault (§ 241, subd. (a)) under her former name (Samuel Valentine), which she had successfully petitioned to change (to Thor Kill) in 2018.

**B.**

The jury convicted Kill of unlawful possession of ammunition by a prohibited person (§ 30305, subd. (a)(1)). The trial court sentenced Kill to a two-year prison term.

**DISCUSSION**

**A.**

Kill contends the trial court erred in denying her motion to quash the warrant and to suppress evidence. She argues the information contained in the search warrant affidavit was stale and did not establish probable cause to search her hotel room or storage unit for ammunition, firearms, or related components and equipment. Kill also argues that the good faith exception does not apply because no reasonable officer would have believed that the affidavit's stale information constituted probable cause. We disagree.

**1.**

A defendant may move to suppress evidence obtained as the result of a search warrant on the basis that there was not probable cause to issue the warrant. (§ 1538.5, subd. (a)(1)(B)(iii).) However, the defendant bears the burden of establishing a search warrant's invalidity. (*People v. Lazalde* (2004) 120 Cal.App.4th 858, 865.)

"The question facing a reviewing court asked to determine whether probable cause supported the issuance of the warrant is whether the magistrate had a substantial basis for concluding a fair probability existed that a search would uncover wrongdoing. [Citations.] 'The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before [them], including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband

3

or evidence of a crime will be found in a particular place.' " (*People v. Kraft* (2000) 23 Cal.4th 978, 1040-1041; accord, *Illinois v. Gates* (1983) 462 U.S. 213, 238.)

"The magistrate's determination of probable cause is entitled to deferential review." (*People v. Kraft, supra*, 23 Cal.4th at p. 1041.) Issuance of the warrant should be overturned " 'only if the affidavit fails as a matter of law to set forth sufficient competent evidence' " supporting the finding of probable cause. (*People v. Westerfield* (2019) 6 Cal.5th 632, 660.)

Moreover, " 'the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants[.]' [Citation.] This reflects both a desire to encourage use of the warrant process by police officers and a recognition that once a warrant has been obtained, intrusion upon interests protected by the Fourth Amendment is less severe than otherwise may be the case." (*Illinois v. Gates, supra,* 462 U.S. at p. 237, fn. 10.)

**2.**

On the same day it was executed (April 27, 2021), San Francisco Police Department officer Gabriel Alcaraz obtained a warrant authorizing the searches of Kill's person, hotel room, and storage unit for ammunition, ammunition manufacturing materials, and firearms-related parts and materials. Alcaraz's search warrant application was supported by his nine-page affidavit.

Alcaraz's affidavit began by describing his more than 19 years of experience as a San Francisco police officer and his work with the Crime Gun Intelligence Unit and the Bureau of Alcohol, Tobacco, Firearms, and Explosives (the Bureau). Alcaraz stated that, on April 26, 2021, he became aware of a tip that had been made to the Bureau, on February 16, 2021, by a federal explosives licensee. The tip relayed that Kill had called and left a

4

voicemail identifying herself and providing contact information. Kill stated that she wished to purchase 25 pounds of "GoEx Reenactor Powder" and have it shipped to a P.O. Box. When the licensee returned the call and asked about the nature of Kill's reenactment activities, Kill replied, " 'someone is going to shoot you for asking those types of questions.' " The licensee declined to sell the powder to Kill and terminated the phone call.

Alcaraz stated that he had directly spoken with the licensee, on April 27, 2021, and she had confirmed her prior statements and explained that she had been suspicious of Kill's desire to purchase 25 pounds of black powder and have it shipped to California—as the black powder she sells is primarily used for Civil War and Revolutionary War reenactments.[2]

Alcaraz used the phone number and email address Kill had provided to conduct a search for matching accounts in a law enforcement database. He discovered a YouTube account for "THOR KILL," a Facebook profile for "Thor Killu," and an Instagram profile for "thorkillu." The social media accounts (linked to Kill's contact information) posted photos and videos of ammunition manufacturing equipment, including a "reloading machine," a Hornady iron press, and a Hornady gun powder measure container. Alcaraz opined that these items were real (not props) and are commonly used to manufacture ammunition for personal use. Although the videos for the last two items were uploaded more than a year earlier (on November 27, 2019 and February 2, 2020 respectively), Alcaraz believed Kill still possessed the items. Alcaraz also viewed photos, posted on the "thorkillu" Instagram profile approximately 40 weeks earlier, showing a "1911 type" firearm frame in various stages of manufacturing. Kill's Facebook and YouTube profiles also

---

[2] A Bureau special agent told Alcaraz that 25 pounds of black powder is "substantially more" than what is needed to manufacture or reload ammunition for personal use.

included Nazi imagery and links to information about mass shootings and other violent incidents.

On April 26, 2021, Alcaraz learned of another tip reported to the San Francisco Police Department tip line on March 23, 2021. An employee of a New York company that manufactures outdoor hunting weapons stated that an individual with Facebook profile name "Thor Killu" had left comments on the company's Facebook posts. When the employee looked at the commenter's Facebook account, he found antisemitic material and content involving mass shootings and other violence. Alcaraz contacted the tipster shortly before applying for the search warrant and the tipster confirmed the accuracy of his tip. However, when Alcaraz searched Kill's Facebook and Instagram profiles, he could not corroborate some of what the tipster had purportedly read.

After reviewing criminal databases, Alcaraz believed Kill was also known as Samuel Valentine, who appeared to be subject to a lifetime ban on possessing firearms and ammunition due to a previous finding of being gravely disabled.[3] Accordingly, Alcaraz believed that a search of Kill's hotel room and storage unit would uncover evidence that she was illegally in possession of firearms, ammunition, or materials for manufacturing firearms or ammunition.

Before trial on the instant charges, Kill moved to suppress the evidence obtained on April 27, 2021, and to quash the search warrant, on the grounds, among others, that it was not supported by probable cause because the information was stale. (See § 1538.5, subd. (a)(1)(B)(iii).) The trial court denied Kill's motion. The court explicitly found that the affidavit was not stale because of "[t]he April 26, 2021 tip" regarding the reenactor powder and

_____

[3] Alcaraz also noted that Kill had stated, in a social media post, that she has many challenges " 'due to [her] inability to think clearly or perceive in a cognitive [*sic*] manner.' "

6

Kill's alleged statement—that " '[s]omeone is going to shot [*sic*] you for asking those types of questions.' "  The court acknowledged that the images or videos of ammunition manufacturing equipment Kill posted on social media were stale, but the court stated it used this evidence solely as "context for [the later] statements."

**3.**

The information Alcaraz provided was not too stale to support probable cause that firearms or ammunition would be found in Kill's hotel room or storage unit.

Information contained within an affidavit may be deemed stale and unworthy of consideration if it is too remote in time to justify a finding of probable cause at the time the search warrant is sought.  (*People v. Hulland* (2003) 110 Cal.App.4th 1646, 1652.)  However, there is no bright-line rule for determining when information becomes stale; the question depends on the circumstances involved in each case.  (*People v. Carrington* (2009) 47 Cal.4th 145, 163.)

To determine whether information is stale, courts consider many variables, including the nature of the crime, the criminal, the thing to be seized, and the place to be searched.  (*People v. Wilson* (1986) 182 Cal.App.3d 742, 754.)  Accordingly, it is not unusual for courts to uphold warrants despite significant delays intervening between the issuance of a warrant and the underlying evidence of criminal activity—if there is reason to believe that criminal activity is ongoing or that evidence of criminality remains in the location to be searched.  (*People v. Carrington, supra,* 47 Cal.4th at p. 164; *People v. Stipo* (2011) 195 Cal.App.4th 664, 672.)  "Substantial delays do not render warrants stale where the defendant is not likely to dispose of the items police seek to seize."  (*Stipo,* at p. 672.)

Here, in contrast to the drug cases on which Kill relies (see e.g. *People v. Hulland, supra*, 110 Cal.App.4th at pp. 1652-1653; *Hemler v. Superior Court* (1975) 44 Cal.App.3d 430, 433-434), there was good reason (in April 2021) to believe that ammunition or firearms would still be (illegally) in Kill's possession at her rented storage unit or at the hotel room where she was sheltering in place. (See *People v. Mesa* (1975) 14 Cal.3d 466, 470 ["an affidavit in support of a search warrant must provide probable cause to believe the material to be seized is still on the premises to be searched when the warrant is sought"].) Courts have repeatedly recognized that, unlike drugs which are quickly consumed or sold, it is not unreasonable to believe that firearms and ammunition will be retained for long periods of time. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 369-370; *People v. Lazarus* (2015) 238 Cal.App.4th 734, 764-765 (*Lazarus*) [20 year delay]; *United States v. Neal* (8th Cir. 2008) 528 F.3d 1069, 1074 [information concerning someone who is suspected of possessing firearms illegally is not stale, "even several months later," because it is reasonable to believe "individuals who possess firearms tend to keep them for long periods of time"].)

The February 2021 tip suggested that Kill was, approximately two months before the search, trying to obtain large quantities of a material used to make ammunition. Although there may be innocent reasons for someone (who is prohibited from possessing ammunition) to obtain reenactor powder, Kill's response to the licensee's question (along with the quantity she was seeking) effectively ruled those innocent uses out.

Kill urges us to exclude consideration of the reenactor powder tip because the trial court purportedly made a finding that the tip was received in April (rather than February) 2021, which is undisputedly not supported by substantial evidence. But we do not view the record as containing an unsupported

8

factual finding. Rather, it appears that the trial court was speaking in shorthand when it referred to "[t]he April 26, 2021 tip." After all, the reenactor powder tip was relayed from the Bureau to Alcaraz on April 26, 2021.

In any event, we independently review the trial court's determination that a warrant was supported by probable cause. (See *Lazarus, supra*, 238 Cal.App.4th at p. 764.) Given the nature of the material at issue, as well as the social media context suggesting Kill's longstanding interest in firearms and ammunition manufacture—which is not a momentary or fleeting enterprise—we are not particularly troubled by the age of the February 2021 tip. The magistrate could reasonably infer that someone who sought that quantity of black powder (even unsuccessfully) approximately two months before the warrant application—and made barely veiled threats while doing so—was likely to have tried again. The tip (and its supporting social media context) was not so old when we consider the nature of the crime and the nature of the items to be seized. And the affidavit further stated that Alcaraz verified (with a hotel employee) Kill's shelter-in-place occupancy of the room ultimately searched and confirmed her rental of the storage unit.

Accordingly, even after a lapse of approximately two months between the tip and the warrant application, the magistrate had a substantial basis for concluding there was a fair probability that ammunition, firearms, or their components would still be found at Kill's long-term hotel room and storage unit. (See *People v. Bryant, Smith and Wheeler, supra*, 60 Cal.4th at pp. 369-370; *Lazarus, supra,* 238 Cal.App.4th at pp. 764-765.) Kill has not met her burden of establishing the invalidity of the search warrant.

9

**4.**

Even if we were to assume that the evidence in the affidavit was insufficient to support probable cause, we conclude that the good faith exception to the exclusionary rule, as set out in *United States v. Leon* (1984) 468 U.S. 897 (*Leon*), applies here.

In *Leon*, our nation's high court held the Fourth Amendment's exclusionary rule should not bar the use of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause. (*Leon, supra*, 468 U.S. at p. 900; *People v. Camarella* (1991) 54 Cal.3d 592, 596.) Exclusion of evidence is only required when "a well-trained officer should reasonably have known that the affidavit failed to establish probable cause (and hence that the officer should not have sought a warrant)." (*Camarella, supra*, at p. 596, italics omitted.)

We do not believe that a well-trained officer should reasonably have known that Alcaraz's affidavit failed to establish probable cause. The affidavit was not " 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.' " (*Leon, supra*, 468 U.S. at p. 923.) The trial court did not err in denying Kill's motion to suppress.

### DISPOSITION

The judgment is affirmed.

BURNS, J.

WE CONCUR:


JACKSON, P. J.
CHOU, J.

*People v. Kill (A167966)*